# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

RUFUS WEST,

        Plaintiff,

    v.                                     Case No. 06-C-763

JEFFREY ENDICOTT, et al.

        Defendants.

---

## DECISION AND ORDER

---

      This § 1983 case arises out of the treatment of the inmate plaintiff's legal mail and the denial of certain publications by various prison employees. Pursuant to this court's screening order, Plaintiff Rufus West was allowed to proceed on some thirty-one claims, all involving incoming or outgoing mail. Both sides have filed motions for summary judgment. For the reasons given herein, the defendants' motion will be granted in part as to all but one claim. The plaintiff's motion will be denied.[1]

## I. The Claims

      West's claims can be grouped into two general categories. The first group involves claims that potentially impact West's free speech rights and his ability to meaningfully access the courts: Claims 1-16 involve incoming legal mail that was opened outside of West's presence, and Claims

---

[1] Herein I address the legal merit of the claims without getting into the factual detail required to assess the personal involvement of each defendant in each claim. I therefore refer to the defendants generically throughout.

29-31 involve the defendants' failure to use certified mail to send West's notices of claims to the state. The other category, Claims 17-28, involves the defendants' censorship of West's incoming mail, primarily publications and newsletters that the defendants believed could have a detrimental impact on security or inmate rehabilitation.[2]

## II. Legal Mail and Access to the Courts

### A. West's Claims

Claims 1-16 all involve the defendants' opening of West's legal mail outside of his presence, and Claims 29-31 assert that the defendants failed to submit West's notices of claim by certified mail:

> Claim 1: First Amendment; mail from EDWI opened outside West's presence on 10-15-99 by Defendants Luetkens & Bandeko;
>
> Claim 2: First Amendment; mail from Attorney Terry E. Williams opened outside West's presence on 1-18-01 by Defendants Christian, Haberstein & Lardinois;
>
> Claim 3: First Amendment; mail from Attorney Robert Mayer opened outside West's presence on 4-30-01 by Defendants Christian & Lardinois;
>
> Claim 4: First Amendment; mail from Attorney Susan Rosenberg (returned to West) opened outside West's presence on 9-10-01 by Defendants Loskot, S. Grondin, & Wetter;
>
> Claim 5: First Amendment; mail from Attorney Cynthia Manlove (returned to West) opened outside West's presence on 9-10-01 by Defendants Loskot, S. Grondin, & Wetter;
>
> Claim 6: First Amendment; mail from law firm Garvey & Stoddard opened outside West's presence on 11-21-01 by Defendants Loskot, S. Grondin, & Wetter;

---

[2] The defendants have helpfully summarized all of West's claims in their brief, and West has not objected to that summary. The claim summary is reproduced, as relevant, at the beginning of each section below.

2

Claim 7: First Amendment; mail from Attorney Robert Mayer opened outside West's presence on 3-4-02 by Defendant S. Grondin;

Claim 8: First Amendment; mail from Dane County Judge Krueger opened outside West's presence on 10-2-02 by Defendant S. Grondin;

Claim 9: First Amendment; mail from Attorney Robert Mayer opened outside West's presence on 1-27-03 by Defendant S. Grondin, Wetter & Koenig;

Claim 10: First Amendment; mail from EDWI Magistrate Judge Goodstein opened outside West's presence on 2-4-03 by Defendant McCullough;

Claim 11: First Amendment; mail from Attorney Robert Mayer opened outside West's presence on 3-4-03 by Defendant S. Grondin;

Claim 12: First Amendment; mail from U.S. DOJ (returned to West) opened outside West's presence on 9-2-03 by Defendants J. Huibregtse & S. Grondin;

Claim 13: First Amendment; mail from the Clerk, EDWI, opened outside West's presence on 2-9-04 by Defendants J. Huibregtse, S. Grondin & Eggers;

Claim 14: First Amendment; mail from the U.S. Marshals, EDWI, opened outside West's presence on 4-5-04 by Defendants J. Huibregtse & S. Grondin;

Claim 15: First Amendment; mail from the Prisons Self Help Legal Clinic opened outside West's presence on 5-16-05 by Defendant S. Grondin;

Claim 16: First Amendment; mail from state DOJ opened outside West's presence on 8-7-06 by Defendant J. Huibregtse;

Claim 29: First / Fourteenth Amendment; denial of request to mail notices of claims via certified mail on 5-7-06 by Defendants Asperson, S. Grondin, Gerber & J. Huibregtse;

Claim 30: First / Fourteenth Amendment; denial of request to mail notices of claims via certified mail on 5-21-06 by Defendants Carpenter, S. Grondin, Gerber & J. Huibregtse;

Claim 31: First / Fourteenth Amendment; denial of request to mail notices of claims via certified mail on 6-13-06 by Defendants Lange, S. Grondin, & Gerber.

3

**B. Exhaustion**

The defendants first contend that claims 3, 4, 5, 6, 7, 11, 17, 18, and 19 should be dismissed because West failed to properly exhaust available administrative remedies. The Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), provides that no action shall be brought with respect to prison conditions under § 1983 or any other federal law by a prisoner confined in any prison until such administrative remedies as are available are exhausted. The PLRA's exhaustion requirement is mandatory and applies to all prisoners seeking redress for wrongs in the prison. *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The court must address the exhaustion issue immediately and resolve disputes about its application before turning to other issues in the suit. *Perez v. Wisconsin Dept. of Corrections*, 182 F.3d 532, 536 (7th Cir. 1999). "To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require. *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). " *Id*. at 1025. "[A] prisoner who does not properly take each step within the administrative process has failed to exhaust state remedies." *Id.* at 1024.

In order to exhaust available administrative remedies, Wisconsin requires inmates to file offender complaints through the Inmate Complaint Review System (ICRS), outlined in Wis. Admin. Code ch. DOC 310. *See* §§ DOC 310.05, 310.08. With certain exceptions not applicable to this case, an inmate may use the ICRS to raise significant issues regarding rules, living conditions, staff actions affecting institution environment, and civil rights. § DOC 310.08(1). The first step in the procedure is an inmate filing an Offender Complaint with the Inmate Complaint Examiner (ICE). §§ DOC 310.09, 310.11. The Offender Complaint must be filed within fourteen calendar days of the event giving rise to the complaint, § DOC 310.09(6), and the Offender Complaint must clearly

4

identify the issue that the inmate seeks to raise. § DOC 310.09(1)(e). The ICE makes a recommendation on the Offender Complaint to the appropriate institution level reviewing authority. § DOC 310.11(1)-(4). The Offender Complaint is then decided by the appropriate reviewing authority whose decision (if it is adverse to the inmate) can be appealed to the Corrections Complaint Examiner (CCE). §§ DOC 310.12, 310.13. Absent good cause, appeals to the CCE must be made within ten days. § DOC 310.13. The CCE then makes a recommendation to the DOC secretary, who takes final action. §§ DOC 310.13, 310.14. The failure to properly complete each step in the ICRS grievance procedure constitutes failure to exhaust available administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 2382 (2006) ("Prisoners must now exhaust all "available" remedies, not just those that meet federal standards."); *Pozo*, 286 F.3d at 1025.

In this case, it is undisputed that West failed to exhaust his administrative remedies as to Claims 3, 4, 5, 6, 7, 11, 17, 18, and 19. He failed to appeal a rejected offender complaint to the Warden as to Claim 3, an administrative remedy that he was expressly instructed to pursue (DFOF ¶¶ 23-24). As to Claims 4, 5, 18, and 19, West failed to file a timely offender complaint, and they were rejected on that basis (DFOF ¶¶ 25-28, 32-39). And for Claims 6, 7, 11, and 17, West filed no offender complaints (DFOF ¶¶ 29-31, 40).

West's only response is to Claims 4-7, as to which he claims that he was barred from filing complaints due to the prison's regulation allowing only two complaints to be filed per week. *See* Wis. Admin. Code DOC § 310.09(2). He argues that under *Dale v. Lappin*, 376 F.3d 652 (7th Cir. 2004), his failure to file must be excused. *Dale* held that prison officials may not block a prisoner's access to the ICRS and then assert that the prisoner failed to exhaust his administrative remedies.

5

*Id.* at 656. But Dale was denied access to prison forms. *Id.* Here, by contrast, West failed to comply with a reasonable limitation of the number of complaints an inmate could file within one week. The rule does not prohibit the filing of any complaints so much as it requires the inmate to prioritize his claims – otherwise, an inmate could simply flood the complaint system with frivolous complaints and thereby evade the PLRA's exhaustion requirement altogether. The rule is not, in other words, an excuse for failure to exhaust.

Under *Perez,* these claims, as well as those for which West offers no explanation for his failure to completely exhaust his administrative remedies, will be dismissed without prejudice rather than on their merits. But as will be shown below in the discussion of the remaining claims, each suffers from further defects that ultimately prove fatal.

## C. Free Speech and Access to the Courts

Courts have deemed prisoner mail to be an important component of the spectrum of rights retained by incarcerated individuals; the Seventh Circuit has summarized the constitutional principles governing prisoner mail as follows:

> Inmates have a First Amendment right both to send and receive mail, *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir. 1999), but that right does not preclude prison officials from examining mail to ensure that it does not contain contraband, *Wolff v. McDonnell,* 418 U.S. 539, 576; *Rowe,* 196 F.3d at 782. An inmate's legal mail, however, is entitled to greater protections because of the potential for interference with his right of access to the courts. *Rowe,* 196 F.3d at 782. Thus, when a prison receives a letter for an inmate that is marked with an attorney's name and a warning that the letter is legal mail, officials potentially violate the inmate's rights if they open the letter outside of the inmate's presence. *See Wolff,* 418 U.S. at 577, 94 S.Ct. 2963; *Castillo v. Cook County Mail Room Dep't,* 990 F.2d 304, 305-06 (7th Cir. 1993).

*Kaufman v. McCaughtry,* 419 F.3d 678, 685-86 (7th Cir. 2005).

6

Before proceeding too far, it is important to identify the precise contours of the right West asserts. West does not assert that he was inhibited from receiving mail or communicating with anyone. He does not claim that the defendants have censored his legal mail in any way. Instead, West's claims are largely limited to the assertion that the defendants opened some of his legal mail outside his presence. It is clear, as discussed below, that such claims have a footing in an inmate's right to access the courts, the theory being that an inmate's ability to prosecute or defend litigation might be adversely affected if his legal mail were subject to opening by others. As the Eleventh Circuit put it, one's right to freely access the courts "depends on confidentially communicating with his attorneys." *Al-Amin v. Smith,* 511 F.3d 1317, 1331 (11th Cir. 2008); *see also Wolff v. McDonnell,* 418 U.S. 539, 576 (1974).

But in addition to an access-to-the-courts claim, is there an independent First Amendment violation based on such claims? (As discussed below, the distinction is not merely academic.) West does not allege that the *content* of any communications has been affected or delayed, and thus his claims do not find their grounding in those typical First Amendment considerations that protect the flow of ideas and freedom of speech: simply put, no communications have been curbed, they have just been opened. Nevertheless, some circuits have recently found an independent First Amendment claim based on allegations of a prison's pattern or practice of opening confidential legal mail. For instance, in the Third Circuit's view, confidential communication with one's attorney is protected as an "end in itself," *i.e.*, regardless of whether it impacts an inmate's ability to access the courts. *Jones v. Brown,* 461 F.3d 353, 359 (3d. Cir. 2006). A prison's practice of opening such mail, the court found, "interferes with protected communications, strips those protected communications of their confidentiality, and accordingly impinges upon the inmate's right

7

to freedom of speech." *Id.* The Eleventh Circuit has also followed this analysis, finding a "free speech right to communicate with [one's] attorneys by mail, separate and apart from his constitutional right to access the courts." *Al-Amin,* 511 F.3d at 1334.

This First Amendment right is of quite recent vintage, however, and it is difficult to discern why these courts consider the confidentiality of legal mail as an "end in itself" entitled to independent First Amendment protection rather than simply as a means of accessing the courts. Recall that the legal mail is not being censored, delayed or destroyed; indeed, it does not even appear that it is being read – it is merely being opened.[3] As such, in a case like this, there is no disruption in the content or message of any communications. It is not the message contained in legal mail that is curbed, but the confidentiality of that mail: the violation is one of secrecy rather than substance. Secrecy is not "speech," of course, but it is really only that secrecy that the Third and Eleventh Circuits are protecting as an "end in itself." Because secrecy itself is not communicative expression entitled to First Amendment protection, the only way to view it is as a *means* or instrumentality. But an instrumentality of what? Protecting the secrecy of legal mail does not aid inmates in expressing political views, writing poetry or complaining about prison conditions,

---

[3]According to the affidavits of the Correctional Officers who actually opened West's legal mail, their actions were inadvertent. Each was aware of the DOC policy requiring that properly marked "legal mail" was to be opened in the presence of the inmate to whom it was addressed. However, the mail rooms in which the Officers worked processed hundreds of pieces of mail per day, and in the course of completing their work, legal mail would sometimes be inadvertently opened. When an inmate's legal mail was opened outside of the addressee's presence, the envelope would be stamped "OPENED IN ERROR." Each of the Officers stated that he or she had no knowledge or interest in West's dealings with his attorney and treated the inmates and their mail in a consistent and fair manner. (Aff. of Francis Lardinois, ¶¶ 5-11; Aff. of Allen Christensen, ¶¶5-11.)

8

because they could just as easily write about such complaints in *non-legal* mail, correspondence which could duly be opened by the prison. Such mail would not properly be considered "legal" mail in any case. Thus, the veil of secrecy that protects legal mail does not protect the content of any "speech" occurring outside of the legal context – no important political ideas or religious opinions are affected by a protection for legal mail. Obviously, then, the only purpose secrecy serves in the legal mail context is that it allows inmates to communicate more freely with their attorneys, which of course was the genesis of courts' heightened protections for legal mail in the first place. As such, to the extent the secrecy of legal mail is worth protecting, it is only to the extent it is instrumental in receiving sound legal advice, which ensures uninhibited access to the courts. Because there is no other content-based reason to give legal mail heightened protection, I fail to see why some other courts have found the secrecy of legal mail to be an end in itself regardless of any access to the courts considerations.

Unlike the Third and Eleventh Circuits, the Seventh Circuit has not specifically found any independent First Amendment interest in inmate legal mail when the only allegation is that the mail was opened, rather than withheld, delayed, destroyed, etc.; in contrast, every one of its cases discussing legal mail couches the right at issue solely in terms of access to the courts. "An inmate's legal mail . . . is entitled to greater protections because of the potential for interference with his right of access to the courts." *Kaufman,* 419 F.3d at 685-86; *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir. 1999)*; cf. Antonelli v. Sheahan,* 81 F.3d 1422, 1431-32 (7th Cir. 1996) (First Amendment implicated when prisoner alleged that legal mail was opened, delayed for significant periods of time, and sometimes stolen); *Geder v. Godinez,* 2000 WL 874804, *3 (7th Cir. 2000) (opening and

9

tampering with legal mail).[4]  Further, I note that an unpublished opinion rejects the notion that a separate First Amendment right exists apart from the access to the courts context:

> The district court properly dismissed Mr. Lewis's access to the courts claim. . . . Mr. Lewis also attempts to assert a First Amendment claim, which also fails. Even accepting Mr. Lewis's assertion that nine pieces of his legal mail were opened outside his presence, he fails to allege that this was the result of a 'content-based prison regulation or practice.' *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir. 1999). Furthermore, he does not allege that the mail room staff delayed or lost any of his legal mail and thus, their actions did not violate the First Amendment.

*Lewis v. Cook County Bd. of Com'rs,* 6 Fed. Appx. 428, 430, 2001 WL 435694, **2 (7th Cir. 2001).

The conclusion that West's claim is properly viewed only in the access to the courts context is also supported by Judge Crabb's thorough opinion explaining the shifting sands on which the purported First Amendment right at issue sits.  In *Vasquez v. Raemisch,* 480 F. Supp. 2d 1120, 1138-39 (W.D. Wis. 2007), the court concluded that there was in fact no independent First Amendment right to receive unopened legal mail.  The court first noted that *Wolff v. McDonnell,* in which the Supreme Court found constitutional a prison's practice of opening legal mail in an inmate's presence, has been overextended by attorneys and courts.  In fact, the *Wolff* court found that the right to receive private legal mail was quite undefined:

> Respondent asserts that his First, Sixth, and Fourteenth Amendment rights are infringed, under a procedure whereby the State may open mail from his attorney, even though in his presence and even though it may not be read.  To begin with, the constitutional status of the rights asserted, as applied in this situation, is far from

---

[4] In fact, the link between private legal mail and access to the courts goes back three decades. In *Bach v. Illinois,* 504 F.2d 1100, 1102 (7th Cir. 1974) the Seventh Circuit noted:

> An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to redress his grievances is particularly important.  We think that contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts . . . The potential for diluting privacy in communication between attorney and client is particularly acute in the facts before us.

10

clear. . . . Furthermore, freedom from censorship is not equivalent to freedom from inspection or perusal.

*Wolff v. McDonnell,* 418 U.S. 539, 575-76 (1974).

Although the Constitution guarantees inmates a right to receive mail, the *Vazquez* court noted that prisons can open other kinds of inmate mail, and the Supreme Court has not identified any *content*-based reason that legal mail would receive heightened protection. 480 F. Supp. 2d at 1138. "If the court of appeals has concluded that the danger in chilling free speech is outweighed by security concerns with respect to mail in general, it is difficult to argue that a different conclusion applies with respect to legal mail." *Id.* at 1140. Thus, the court concluded that there is no independent First Amendment right to receive unopened legal mail.

Based on the above, I conclude that when the allegation is merely that legal mail was improperly opened – rather than destroyed or delayed – the right is only actionable in this circuit to the extent the violation inhibits the inmate's ability to access the courts; the right to receive unopened legal mail is not, in other words, entitled to independent First Amendment protection.[5] With that framework in mind, I will proceed to address West's claims that various correspondence was improperly opened.

I first note that most of the mail at issue likely does not qualify for heightened protection as "legal mail" at all – these include the mailings from public agencies such as clerks of court or

----

[5] To the extent *Jones* is to the contrary, however, it is distinguishable because that case involved a challenge to a prison-wide policy rather than a few isolated instances of mail opening. It is conceivable that a broad system-wide policy (as in *Jones*) of reading *all* attorney-client communications could be so broad that it could be expected to actually chill free speech. In other words, to the extent *Jones* is correct that an independent First Amendment right exists in the legal mail context, West's claims fail because he is alleging only a few isolated instances of reading mail, rather than a policy or consistent practice, and that cannot reasonably be expected to curb any protected speech.

11

judges, none of which were marked as confidential legal mail.[6]  Several other letters were mail that West had sent *to* attorneys but were returned to him (marked "return to sender") and then opened by the prison upon their return.  In the past, inmates have on occasion attempted to circumvent the proper inmate-to-inmate mail procedures by putting another inmate's return address on the envelope and then intentionally rendering the mail undeliverable by, for example, affixing insufficient postage, so that the mail is returned to the institution, which then delivers it to the inmate named on the return address.  (Aff. of Tom W. Haberstein, ¶¶ 14-17.)  It is difficult to see how the opening of such letters – which were never even communicated – could violate any protected rights.

The defendants concede, however, that Claims 3, 6, 7, 9 and 15 – letters sent to West over more than four years – involve private mail from attorneys that should have been opened in West's presence.  They assert, however, that these occasions were simply random and accidental errors that occurred over a long period of time, and thus should not constitute a constitutional violation.  *Gardner v. Howard,* 109 F.3d 427, 431 (8th Cir. 1997) ("We have never held or suggested that an isolated, inadvertent instance of opening incoming confidential legal mail will support a § 1983 damage action.")[7]

---

[6] The Seventh Circuit suggested matters of public record are not entitled to "legal mail" protection in *Martin v. Brewer,* 830 F.2d 76, 78 (7th Cir. 1987), but that statement has subsequently been described as dicta.  There appears to be some uncertainty about what constitutes "legal mail," but the Seventh Circuit's most recent description of the right at issue is found in *Kaufman:* "when a prison receives a letter for an inmate that is marked with an attorney's name and a warning that the letter is legal mail, officials potentially violate the inmate's rights if they open the letter outside of the inmate's presence."  419 F.3d at 686.

[7] To the extent an independent First Amendment right to receive unopened mail exists, as in *Jones,* I conclude it was not violated in this case.  The incidents West complains of occurred over several years and are thoroughly isolated.  West speculates about the defendants' motives, but it is unrefuted that the defendants who opened the mail were essentially mail room employees with no plausible interest in West's litigation or other legal communications.  As such, he merely alleges that various defendants were negligent, and that is not enough for § 1983 liability.

12

Because West's claim is limited to an access to the courts claim, the claim is only actionable if the defendants' actions caused "actual injury" by "frustrat[ing]," "imped[ing]," or "hinder[ing] his efforts to pursue a legal claim." *Lewis v. Casey,* 518 U.S. 343, 351-53 n.3 (1996). In *Lewis,* the Supreme Court found that although an inadequate law library could interfere with an inmate's right to access the courts, inmates must show that they were actually injured by the library's alleged inadequacies. In other words, the inmate must

> demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim. He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

*Id.*

For example, in *Simkins v. Bruce,* 406 F.3d 1239, 1243 (10th Cir. 2005), the prison withheld an inmate's legal mail altogether, which included a summary judgment motion filed in a civil action he had brought, and the delay adversely impacted that civil action. The Tenth Circuit had no trouble finding injury, concluding that "the prejudice from the interference with plaintiff's legal mail is directly and inextricably tied to the adverse disposition of his underlying case and the loss of his right to appeal from that disposition." *Id.* at 1244. In contrast, in *Al-Amin, supra,* the defendants opened the inmate's legal mail outside his presence, but the Eleventh Circuit found the plaintiff had failed to meet the requirement that he show actual prejudice resulting from the violation:

> Al-Amin's testimony contains only a conclusory allegation that the mail opening compromised his cases and does not identify how any legal matters specifically were damaged. At most, [his wife's] affidavit states conclusorily that "[t]he violation of opening legal mail from my office over more than a three-year period has caused harm to the client/attorney privilege, confidentiality of legal matters, and in

13

satisfying deadlines." Her affidavit provides no specific cases or claims being pursued, nor any deadlines missed, nor any effect on Al-Amin's legal claims.

511 F.3d at 1331. Similarly, the Seventh Circuit has also rejected inmates' conclusory attempts to show prejudice: "Although Mr. Lewis's second amended complaint alleges that he suffered 'chilling effects, stomach pains, insomnia, and fear at the denial of his right to attorney-client privilege and sanctity of the mails,' he does not describe a single legal case or claim that was in any way thwarted because the mail room staff opened his legal mail." *Lewis v. Cook County Bd. of Com'rs,* 6 Fed. Appx. at 430, 2001 WL 435694, **2.[8] Here, West does not even attempt to show that he was harmed by any opening of his mail. He simply says that the defendants offered no excuse for doing it and that it was likely a result of their desire to read his communications. That is not injury. Accordingly, the defendants are entitled to summary judgment on West's legal mail Claims 1-16. *See also Kaufman v. McCaughtry,* 419 F.3d 678, 686 (7th Cir. 2005) ("to the extent Kaufman claims that the opening of his mail impeded his access to the courts, he offered no evidence that his ability to litigate any matter was affected by the defendants' actions.")[9]

The same result holds with respect to the claims that the defendants improperly failed to send West's notices of claim to the state via certified mail. The certified mail requirement is a component of the state's administrative process, and allows the state to avoid arguments about

---

[8] In contrast to the courts of appeals that found an independent First Amendment right to receive private legal mail, in my view the adequacy of a prison law library is analogous to the adequacy of communication with one's attorney. In some sense, one's lawyer is something like an interactive law library – both are entitled to constitutional protections to the extent they allow an inmate full access to the courts, and apart from that instrumental function there is no independent reason to give them constitutional protection.

[9] The injury requirement is an additional reason to conclude this circuit would not find an independent First Amendment violation. Because it routinely treats such claims as access to the courts claims, a violation *not* requiring a showing of injury would circumvent that entire approach.

14

whether an individual actually filed such a notice. *Gidarisingh v. McCaughtry,* 2005 WL 2428155,

*6 (E.D. Wis. 2005). The defendants assert that they simply made a mistake in using First Class

mail and, when the mistake was discovered, they obtained a waiver of the certified mail requirement

from the appropriate state official. (DPFOF ¶¶ 143-146.) As such, West's notices of claim were

deemed filed and thus West's ability to access the courts has not been harmed in any conceivable

manner. Although West protests that courts will summarily dismiss any civil complaints he files

based on those claims, that is pure speculation. Moreover, as West notes elsewhere, defendants may

not obstruct a plaintiff's attempts to exhaust remedies and later hold the failure to exhaust against

the plaintiff. For all intents and purposes, the defendants are estopped from asserting West's failure

to use certified mail as a defense to any action West might bring based on those claims, and there

is thus no plausible showing that West's ability to access the courts has been (or will be) affected.


## III. Censorship Claims

Claims 17-28 involve the prison's refusal to allow West access to certain publications,

including several newsletters from the "Maoist International Movement" and "Prison Action

Coalition." As summarized by the defendants, the claims are as follows:

> Claim 17: First Amendment; denial of Maoist International Movement (MIM)
> publication on 11-10-99 by defendants Endicott, Dittberner, Parker, Douma,
> Luetkens, Bandeko, & Hodgkins;
>
> Claim 18: First Amendment; denial of Maoist International Movement (MIM)
> publication on 12-6-99 by defendants Endicott, Dittberner, Parker, Douma,
> Luetkens, Bandeko, & Hodgkins;
>
> Claim 19: First Amendment; denial of Maoist International Movement (MIM)
> publication on 12-22-99 by defendants Endicott, Dittberner, Parker, Douma,
> Luetkens, Bandeko, & Hodgkins;

15

Claim 20: First Amendment; denial of Inside Out ["FFUP"] Newsletter #4 on 11-26-03 by defendants Berge & Frank;

Claim 21: First Amendment; denial of 9-23-05 issue of PAC Newsletter on 9-28-05 by J. Huibregtse, P. Huibregtse, & Frank;

Claim 22: First Amendment; denial of 11-17-05 issue of PAC Newsletter on 11-23-05 by defendants J. Huibregtse, P. Huibregtse, & Frank;

Claim 23: First Amendment; denial of 1-25-06 issue of PAC Newsletter on 1-31-06 by defendants J. Huibregtse, P. Huibregtse, & Frank;

Claim 24: First Amendment; denial of PAC Newsletter on 6-20-06 by defendants S. Grondin, P. Huibregtse, & Frank;

Claim 25: First Amendment; denial of FFUP Newsletter #12 A Bridge of Voices on 7-26-06 by defendants J. Huibregtse, P. Huibregtse & Frank;

Claim 26: First Amendment; denial of mail containing two sheets of CCAP information on another persons on 9-12-05 by defendants S. Grondin, P. Huibregtse, & Frank;

Claim 27: First Amendment; denial of mail from inmate Berrell Freeman on 5-2-06 by defendants P. Huibregtse & Frank;

Claim 28: First Amendment; denial of newspaper clippings on 4-21-06 by defendants J. Huibregtse, P. Huibregtse & Frank.

Analysis of West's First Amendment censorship claims starts with the basic principle that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 (1948). "In the First Amendment context a corollary of this principle is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Prisoner challenges to prison restrictions alleged to violate First Amendment rights are therefore "analyzed in terms of the legitimate policies and goals of the

16

corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law." *Id.*

In *Thornburgh v. Abbott,* 490 U.S. 401 (1989), the Court discussed these principles in the context of a prisoner's challenge to regulations promulgated by the Federal Bureau of Prisons which, like Wisconsin's, authorize prison officials to reject incoming publications found to be detrimental to institutional security. The Court held that the regulations were lawful. In so holding, the Court retreated from any suggestion it had left in *Procunier v. Martinez,* 416 U.S. 396 (1974), that the decisions of prison officials in this area would be subjected to a "strict or 'least restrictive means' test." 490 U.S. at 411. Instead, *Thornburgh* adopted the more deferential reasonableness standard that in *Turner v. Safely,* 482 U.S. 78 (1987), it had found more fitting for the decisions of prison administrators in general. 490 U.S. at 413-14. In *Turner*, the Court recognized that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." 482 U.S. at 85. For this reason, and because "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform," *Thornburgh* concluded that "a strict standard simply was not appropriate for consideration of regulations that are centrally concerned with the maintenance of order and security within prisons." 490 U.S. at 409-10.

Under the *Turner* standard, a prison rule or regulation that impinges on an inmate's constitutional rights is valid "if it is reasonably related to legitimate penological interests."[10]

---

[10] *Turner* set forth a four-part test for analyzing official actions. In the prison censorship context, however, many of these factors, such as the legitimacy of the prison's interest in security and the absence of other approaches to achieving that interest, are presumed. (These were discussed

17

*Turner,* 482 U.S. at 89. Such interests include "security, order, and rehabilitation." *Martinez*, 416 U.S. at 413. A regulation cannot be sustained where the logical connection to a legitimate interest is "so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89-90. In adopting the *Turner* standard, the *Thornburgh* Court noted that in *Martinez* the issue before it was censorship of outgoing inmate mail, which posed little, if any, danger to security unless it touched on matters such as escape plans, plans relating to ongoing criminal activity, or threats of blackmail or extortion. *Martinez* had made clear that prisoner correspondence containing that kind of information could, of course, be censored. *Martinez*, 416 U.S. at 413. But *Martinez* had struck down regulations governing outgoing mail that permitted "censorship of statements that 'unduly complain' or 'magnify grievances,' expression of 'inflammatory political, racial, religious or other views,' and matter deemed 'defamatory' or 'otherwise inappropriate.'" *Id.* at 415. The Court held that prison officials had "failed to show that these broad restrictions on prisoner mail were in any way necessary to the furtherance of a governmental interest unrelated to the suppression of expression." *Id.*

In overruling *Martinez*, *Thornburgh* not only held that the standard of "necessity" suggested by *Martinez* was insufficiently deferential to prison officials; it also noted that incoming material posed a significantly different kind of problem. Incoming publications, the Court observed, consist of "material requested by an individual inmate but targeted to a general audience. Once in the prison, material of this kind reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct." 490 U.S. at 412. Considering the

---

by the Supreme Court in *Thornburgh,* 490 U.S. at 417). The central question is thus whether the regulation, or the official's application of it, has a reasonable relationship to the stated goal. Although some aspects of the *Turner* analysis are partially factual inquiries, the question of whether the challenged action has a reasonable relationship to the stated goal is a legal one.

18

differences between the two, the Court concluded that "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." 490 U.S. at 413.

Because of the greater risk to institutional order and security posed by incoming publications, the *Thornburgh* Court also concluded that "the broad discretion accorded prison wardens by the regulations [there] at issue is rationally related to security interests." *Id.* at 416. Such broad discretion was appropriate, the Court concluded, because it is "rational for the Bureau to exclude materials that, although not necessarily 'likely' to lead to violence, are determined by the warden to create an intolerable risk of disorder under the conditions of a particular prison at a particular time." *Id.* at 417. And in applying the regulation, the Court also upheld the "all or nothing" rule under which the entire publication would be rejected if any portion of it was objectionable. Prison officials need not serve as a kind of super-editor that redacts only the offending passages. *Thornburgh,* 490 U.S. at 418-19.

From *Thornburgh*, it clearly follows that the regulation the defendants applied in denying West several publications that were sent to him is constitutionally valid. The regulation provides that inmates may not receive publications that:

> 1. Teach or advocate violence or hatred and present a danger to institutional security and order.
> 2. Teach or advocate behavior that violates the law of the state or the United States or the rules of the department.
> 3. Teach or describe the manufacture or use of weapons, explosives, drugs, or intoxicating substances.
> 4. Are injurious as defined in s. DOC 309.04 (4) (c) 8.
> 5. Teach or describe the manufacture or use of devices that create a substantial danger of physical harm to self or others.

19

Wis. Adm. Code § DOC309.05(2)(b). Indeed, West does not even challenge the regulation on its face. His challenge is to the defendants' application of the regulation to deny him access to several publications he ordered. I will address each in turn.

### A. "Maoist" Newsletters

The first three of West's challenges involve self-described "Maoist" literature, which officials at Columbia Correctional censored on November 9, December 5 and December 19, 1999. With each denial, a notice of denial was sent to West indicating that the publication was denied because it "teaches or advocated violence and presents a clear and present danger to institution security." (DPFOF ¶ 99.) In particular, the defendants seized on at least one instance in which the publications referred to armed struggle.

I need not explore the defendants' rationale for denying these publications, however, because it is clear that the claims are time-barred (in addition to apparently not being properly exhausted.) As noted in the screening order, the statute of limitations in a § 1983 case like this is six years. *Gray v. Lacke,* 885 F.2d 399, 407-08 (7th Cir. 1989). West's claims arose in late 1999 (or at the latest, early 2000) when he received notice that the publications were being denied and he failed to adequately challenge the prison's actions. He did not file this case until July 2006, more than a half-year late. Accordingly, the defendants are entitled to summary judgment and dismissal of these claims.

### B. Forum For Understanding Prisons Newsletters

Claims 20 and 25 involve the denial of a newsletter originally called "Inside Out," and later changed to "A Bridge of Voices," which is published by an entity called "Forum for Understanding Prisons". (DPFOF ¶¶ 117-120.) The September 2003 publication ("Newsletter #4"), which is the

20

subject of Claim 20, is comprised of a story involving an inmate who was released from "Supermax," a few poems and drawings, and an inmate's article called "Life Within in a Box," the bulk of which is devoted to complaints about prison food, including nutri-loaf.[11] (Ray Aff., Ex. 1003 at 4.) The first article, entitled "Institutional Insanity," describes the severe conditions the inmate endured at Supermax, the strict rules with which he was required to comply, and the severe consequences of noncompliance. The author describes his friend as "one of those guys who beat on his stainless steel toilet or solid steel door with his shoes, day and night. He was one of those guys who screamed and howled, all day, making life miserable for all the others nearby." (*Id.*) After "two years of extreme sensory deprivation," the author states his friend was "dumped into Milwaukee with no money, and no identification." (*Id.* at 5.) The article concludes: "What they did to my friend and the community was criminal, and dangerous. This story could have ended in tragedy, that very day. Maybe DOJ should be called the criminally insane 'justice' system." (*Id.*)

Delivery of the publication to West was denied because prison officials believed it conveyed "a generally negative perception of correctional institutions and contains factual inaccuracies." If shared with other inmates, the deputy warden believed that "it could lead to the disrespect of staff, violence and overall discord amongst the inmate general population." (DPFOF ¶ 118.)

The other Bridge of Voices issue that was censored ("Newsletter #12"), the subject of Claim 25, contains reprints of several professional articles critical of the nations drug laws, decrying especially the high rate of incarceration, with its escalating costs to the taxpayer, and the lack of adequate treatment. (Ray Aff., Ex. 1011 at 3.) Among the numerous criticisms offered, one reads

---

[11]"Supermax" is the correctional institution operated by the Wisconsin Department of Corrections in Boscobel, Wisconsin. This facility had been renamed the Wisconsin Secure Program Facility (WSPF).

"[g]uards protect their job security by touting the dangerousness of prisoners, and by claiming that prisoners cannot be rehabilitated." (*Id.* at 6.) One portion apparently found objectionable by prison officials was a section entitled "*Equal Justice? Drugs, race, and some pretty skewed numbers.*" The article noted that while only 12% of the nations drug users are African American, "blacks constitute almost 35% of those arrested for drug violations, more than 45% of those in federal prisons for drug violations, and almost 60% of those in state prisons for drug offenses." (*Id.* at 7.) In another section, a piece entitled "Just Take Those Shackle Off Me So I Can Tie My Shoes," the author claims that "Amerika shackled [Martin Luther King, Jr.] down like a slave, found him guilty of spreading peace and wanting justice." The article continues, "Just as Amerika brought us to this country in shackles and chains, we are still in them because Amerika say so," and complains that blacks have fallen into "US government's traps of drugs and prison" rather than embracing unity and self-reliance. (*Id.*)

According to the defendants, the issue was prohibited because it "contained racial statements that could erode institution authority and concerns resistance to authority." (DPFOF ¶ 138.) Further, the defendants state that the issue contained a reference to an activity (they do not specify) that would violate either a state or federal law or a department regulation (they do not say which).

No one would seriously argue that the government could, consistent with the First Amendment, deny a free citizen either of the publications described above. Indeed, several of the articles contained in them are reprints of articles that may well have appeared in the mainstream press. The views they express are shared by many in this country. But, of course, that is not the question before the court. The question I must decide is whether state prison officials may constitutionally refuse delivery of a publication containing such matter to a prisoner serving a

22

sentence in a maximum security prison as punishment for a serious crime.  Under *Thornburgh*, the prison officials were acting properly if their actions were reasonably related to a legitimate penological interest.  And in determining whether the conduct of the defendants meets this test, their decision must be given significant deference.  *Thornburgh,* 490 U.S. at 412-13; *see also Shaw v. Murphy*, 532 U.S. 223, 232 (2001).

The interests cited by the defendants to support their actions include maintaining order and discipline so as to insure the security of the institution.  These are "essential goals" of any prison. *Bell v. Wolfish*, 441 U.S. 520, 546 (1979).  In view of the deference that must be afforded state prison officials, I conclude that denial of the above described publications was reasonably related to these interests.  The essential message of the first issue that was withheld is that inmates at WSPF are victims of gross injustice, that the conditions are inhumane, the guards sadistic, and that the entire system is "criminally insane."  The article suggests that one way to deal with the injustice, the way in which the author's friend dealt with it, is to openly resist it – to beat on the stainless steel toilet or solid steel door with his shoes, day and night, and scream and howl all day making life miserable for everyone else.  The other claims that African Americans serving prison terms are the victims of institutional racism that is as much a part of the fabric of the country as it was at the time of slavery.  Both publications convey messages that call into question the legitimacy of the of the system of justice that has imprisoned them and, thus, the authority of the guards who are responsible for controlling their behavior.  Such views, which are no doubt already held by many prisoners, can, if fanned by publications that appear to offer empirical support, undermine the order and discipline that are essential to maintain security within the institution.  At least it is not unreasonable for prison

23

officials to so conclude. I therefore conclude that withholding the above described publications did not violate West's First Amendment rights.[12]

### C. Prison Action Coalition Newsletters

Claims 21-24 involve the prison's denial of *The New Abolitionist*, a publication from a group known as the Prison Action Coalition. (Ray Aff., Exhs. 1006, 1007, 1008, 1013.) The "New Abolitionists" have, as their mission, "the abolition of prisons; more than that, we seek the abolition of the systems of oppression that create the need for prisons; we seek the abolition of police who are enforcers of the systems of oppression that create the need for prisons; we seek the abolition of capitalism as a system that divides us, destroys our environment, and commodifies all things." (Ray Aff., Ex. 1008 at 3.)

The defendants state that the September 2005 newsletter (Claim 21) was censored because it "advocates revolutions and violence to gain power with language such as "mobilization" and "unity in struggle." The mentality this kind of language fosters, they contend, "inhibits the rehabilitative goals of the prison." They further claim that "the newsletter advocates racial discrimination with statements such as '[b]lacks are disproportionately represented in prisons, because they are disproportionately poor,' and '. . . the Black struggle is internationally significant

---

[12]Denying publications such as these may also bear on two other interests not mentioned by the defendants. Blaming one's imprisonment on gross injustice and institutional racism is hardly conducive to an inmate's rehabilitation. And the denial of one's choice of reading materials can also be viewed simply as part of the punishment one is given for committing serious crime. *See Beard v. Banks*, 548 U.S. 521, 126 S.Ct. 25722584 (2006) (Thomas, J., concurring) ("Although Pennsylvania "is free to alter its definition of incarceration to include the retention" of unfettered access to magazines, newspapers, and photographs, it appears that the Commonwealth instead sentenced respondent against the backdrop of its traditional conception of imprisonment, which affords no such privileges.").

24

because it unmasks the barbarous social relations of capitalism and places the enemy on the defensive on his own home ground.'" (DPFOF ¶ 125.)

On the latter point, it seems quite plain that the newsletter does *not* advocate racial discrimination – it *decries* discrimination in the same manner that Newsletter #12, *supra*, did. In fact, it uses the charge of racism as its primary weapon against the prisons it seeks to abolish and the larger economic system of which they are a part. But this does not save the publication. Again, like the "Forum For Understanding Prisons" newsletters, the September issue of the "New Abolitionist" undermines the legitimacy of the prison and the authority of the guards. Indeed, the primary message of the newsletter is that the only sane and just response to the plight of prisoners is revolt. The September issue features a reprint of a 1971 article on George Jackson, one of the most famous, or infamous, prisoners of twentieth century America. The article, entitled "George Jackson: Black Revolutionary," describes Jackson as "a Black revolutionary in the white man's jails," not unlike the African nationalist leaders then held captive in the jails of South Africa. (*Id.* at 5.) According to the author, "George Jackson was jailed ostensibly for stealing 70 dollars. He was given a sentence of one year to life because he was Black, and he was kept incarcerated for years under the most dehumanizing conditions because he discovered that blackness need not be a badge of servility but rather could be a banner for uncompromising revolutionary struggle." (*Id.*) Ultimately, the author claims, Jackson "was murdered because he was doing too much to pass this attitude on to fellow prisoners. He was a political prisoner and a Black freedom fighter. He died at the hands of the enemy." (*Id.*)[13] Also included in the September issue is the statement of Dave

---

[13]Although my conclusion that prison authorities did not violate West's First Amendment rights in withholding this issue of *The New Abolitionist* does not rest on whether the Jackson article is accurate, I note that the Wikipedia account states that Jackson was serving a sentence for armed

Dellinger, one of the Chicago 8, which he made to the court before he was sentenced for incitement to riot in 1970. (*Id.* at 4.)  Again the message is one of revolution to overcome the horrible injustice and racism that allegedly pervades the institutions of government.  According to the newsletter, Jackson and Dellinger "both reflect the attitudes of a different time, a time of struggle and hope, of pain and victory.  Such a time is coming again."  (*Id.* at 3.)

The defendants argue that the newsletter poses "a clear and present danger to institution security."  (Def.'s Br. In Supp. of Mot. for Summ. J. at 19.)  Clearly, they do not; nor need they in order for prison officials to deny prisoners access to them.  The "clear and present danger" test is used to determine the limits of government control of speech outside a prison.

> No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect.  When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious.

*Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940).  As already noted, no one would seriously suggest that government could constitutionally prevent individuals who are not in prison serving

---

robbery of a gas station.  While at San Quentin State Prison in 1966, he founded the Black Guerrilla Family, a Marxist prison gang with political objectives.  Jackson and two other inmates, who became known as the "Soledad Brothers," were charged with the January 16, 1970 murder of prison guard John V. Mills in retaliation for the killing of three black prisoners by another guard at Soledad prison, after a grand jury had ruled the killings of the black prisoners to be justifiable homicides.  On August 21, 1971, three days before he was to go on trial for the murder of the guard, George Jackson was killed during an escape attempt.  His attorney, Stephen Bingham, was thought to have smuggled a pistol to Jackson.  In the failed escape attempt, six people were killed, including three prison guards, two white prisoners, and Jackson himself.  Bingham immediately fled the country, but returned to face trial in 1984 and was acquitted. http://en.wikipedia.org/wiki/George_Jackson_(Black_Panther) (visited on March 30, 2008); see also Paul Liberatore, *The Road To Hell: The True Story of George Jackson, Stephen Bingham, and the San Quentin Massacre* (Atlantic Monthly Press 1996).

26

a sentence for a crime from reading such material. Whatever danger the censored materials pose, it is not "clear and present," as that phrase has been used by the Court. *See Schenck v. United States*, 249 U.S. 47, 52 (1919). But in the prison setting, the danger posed by incoming publications need not be "clear and present" in order for prison administrators to deny them. It is enough to exclude materials that, "although not necessarily 'likely' to lead to violence, are determined by the warden to create an intolerable risk of disorder under the conditions of a particular prison at a particular time." *Thornburgh*, 490 U.S. at 417. The September 2005 issue of *The New Abolitionist* meets this test.

So also do the November 2005 and January 2006 issues of *The New Abolitionist* that were withheld. In the November newsletter (Claim 22) the editors explain their view of prisons:

> We see the Prison Industrial Complex as the epitome of oppressive, racist, and violent behavior by the State. Prisons now suffer the hubris of over-extension that leads to collapse. They are so vile and repulsive that even the thick-headed, violence-prone American public will eventually understand that this police state will also eventually target them. In reading the history of State sponsored punishment, it was the over-zealous public torturing that eventually turned the public against the King. When the State too openly displays its power, people get nervous.

(Ray Aff., Ex. 1007 at 3.) The issue continues with an indictment of the government and the prison system similar to those recounted above. To the charge that the country is racist with "two types of justice in this State (and the World; one for whites (the haves) and a separate one for blacks and [H]ispanics (the have-nots)," is added the claim that current corrections policy is motivated by money: "In closing, try to remember when you think of Criminal Justice; it is not about crime anymore – it's about MONEY!" (*Id.* at 4.) The issue also contains the battle cry of Crazy Horse: "Ho-ka hey! It's a good day to fight! It's a good day to die! Strong hearts, brave hearts to the front! Weak hearts and cowards to the rear." (Ray Aff., Ex. 1007 at 3.)

27

The January 25, 2006 issue (Claim 23) also sets forth battle cry "It's a good day to die." (Ray Aff., Ex. 1008 at 3.) It also contains the description of the mission of the New Abolitionists set forth above. (*Id.*) One feature is on Tookie Williams, a former gang member convicted of murder who became an anti-gang activist while on Death Row in California. According to the article, "Tookie Williams was a consequence of his communit[y's] racist marginalization – of America's internal Black colony and its occupation by racist and brutal police armies." (*Id.* at 8.) The Muslim author, after acknowledging his own acceptance of the death penalty as a just punishment for certain crimes, goes on to state that "the European nation-state, and America in particular, given the racist nature of its evolution has absolutely no right whatsoever to act as a surrogate executor of justice for people of color." (*Id.*) He also offers the following explanation for why so many regard George Jackson as a hero: "Because Comrade George represented uncompromising resistance to a racist system and its political institutions, a system that incarcerated him his entire life for crime that a white boy from suburbia would have done community service for." (*Id.* at 9.)

The defendants contend that these issues were withheld because they include "racially inciteful language such as '[i]t's not even a secret anymore that there exists two types of justice in this State (and the World; one for whites (the haves) and a separate one for blacks and Hispanics (the have nots).'" (DPFOF ¶¶ 127, 129.) The prison was also concerned over the statement "[i]t's a good day to fight! It's a good day to die!." (DPFOF ¶ 127.) Defendants contend that these publications pose a threat to the security, orderly operation, discipline and safety of the institution. They also claim they are inconsistent with the treatment or rehabilitative goals of the institution. (DPFOF ¶¶ 126, 129.)

28

The claim that "there are haves and have-nots, and that the distinction is based on race, is nothing new, and one expects that many inmates share that belief and discuss it frequently. The same is true of the other views expressed in the newsletters. But the issue here is whether the institution must allow inmates to receive publications from the outside that potentially feed the anger and resentment that such beliefs would naturally engender by providing outside support for them that could then circulate among the prison population. The articles, if believed, seriously undermine the moral authority of the prison and its staff to perform their jobs. Why should one comply with unjust and racist jailers? The message conveyed by such articles also undermines rehabilitative efforts by the prison. Why change if the cards are stacked against you and the powerful are intent on keeping you down? Why do you even need to change if you are an innocent victim of an oppressive system? These are not messages that the warden is required to allow into the prison in the form of publications offered to a general audience. Add to this the noble battle cry of a fallen Native American chief, and one can readily understand the concern of those who must work in the prison. In the context of a maximum security prison populated by inmates, some of whom may well believe that their imprisonment is not unlike the plight of Native Americans, it was not unreasonable for the defendants to take the position that phrases advocating fighting or dying in battle could lead to disruptions and impact prison security. I therefore conclude that defendants did not violate West's First Amendment rights in withholding these issues.

Finally, the June 20, 2006 issue (Claim 24) was denied because it "contained contraband and the item posed a threat to the security, orderly operation, discipline and safety of the institution." (DPFOF ¶ 136.) This issue appears to have been destroyed, however, and thus I am left with only the general explanation offered by the defendants as to why it was withheld.

(Huibregtse Aff., ¶ 50.) Presumably, a copy of the newsletter would be available from the Prison Action Coalition. The defendants do not indicate whether any attempt was made to replace the missing copy. Without any evidentiary basis for concluding that the censorship was warranted, I am reluctant to enter any ruling. Accordingly, as to this claim, both motions for summary judgment will be denied.[14]

### D. Other Materials Denied

Claim 26 asserts that the defendants had no reasonable basis for denying West access to two sheets of CCAP (Consolidated Court Automation Program) information about another person. The defendants' concern was that the information (a kind of criminal docket sheet) contained personal information about the individual in question, as well as his crime and sentence. The crime involved sexual assault, a sensitive charge that could be dangerous to the individual defendant if the knowledge became widespread. Thus, the defendants viewed denial of the CCAP information to be especially prudent. I am satisfied that these concerns are reasonably related to the institution's need to promote security. Even though the individual in question does not appear to have been a prison inmate, the defendants have no idea whether he is a relative, gang associate, or has any relationship with any other inmates. As such, the restriction imposed was not unconstitutional.

Claim 27 questions the denial of access to a letter written by another inmate named Berrell Freeman. The defendants state that it was not mail addressed to West, but rather a mistaken delivery of Freeman's mail to West. They simply removed the piece of mail and gave it back to Freeman. This was not a restriction on free speech so much as it was a transfer of property.

---

[14] The defendants do not argue exhaustion with respect to this claim, but it appears West may have failed to follow applicable timelines in filing his inmate complaints. (Ray Aff., Ex. 1013.)

Finally, Claim 28 asserts the unconstitutional denial of certain newspaper clippings. The defendants did not censor the clippings because of their content, but rather because they were sent to West by another inmate. Despite apparently being sent to West by the other inmate, the defendants assert the clippings were the "property" of another inmate and that West was therefore in violation of Wis. Admin. Code § 303.47. They further explain that "[a]ny inmate who gives, receives, sells, buys, exchanges, barters, lends, borrows or takes any property from another inmate without authorization is guilty of an offense. WSPF does not allow this type of activity because it could lead to strong arming, extortion, gambling and other illegal activities." (DPFOF ¶ 134.) Although this is a somewhat creative interpretation of the regulation, I cannot say that the defendants' attempt to regulate exchanges of property between prisoners is unreasonable, especially at WSPF.

## IV. Conclusion

In sum, defendants' motion for summary judgment is granted as to all claims except Claim 24. Defendant Peter Huibregtse will remain in the case, but all other defendants are dismissed. Counsel for the defendant shall advise the court and plaintiff within the next thirty days as to whether the missing newsletter can be replaced. Plaintiff's motion for summary judgment is denied.

**SO ORDERED** this   31st   day of March, 2008.


  s/ William C. Griesbach
William C. Griesbach
United States District Judge

31